[No. 5095.]

## TOM BURNEY *v.* THE STATE.

1. ASSAULT WITH INTENT TO RAPE—CHARGE OF THE COURT.—See the opinion *in extenso* for a charge of the court in a prosecution for assault with intent to rape, *held* error, because, though couched in the language of the code, and correct in the abstract, it erroneously imposes upon the defendant the burden of proving himself innocent of any unlawful intent to perpetrate any offense.

2. SAME.—An assault with intent to commit rape can be established only by proof of force, or attempted force. Proof of threats, as a means resorted to in order to accomplish sexual connection with a female against her will, will authorize only a conviction for an attempt to rape. See the opinion *in extenso* on the question, and note a charge of the court *held* error because, in effect, it authorized the jury to convict of assault with intent to rape upon proof of an attempt to commit rape.

3. SAME.—INDICTMENT for assault with intent to commit rape will not support a conviction for an attempt to commit rape.

APPEAL from the District Court of McLennan. Tried below before the Hon. Eugene Williams.

The conviction in this case was for an assault with intent to commit a rape upon one Maggie Schuster, in McLennan county, Texas, on the twenty-fourth day of March, 1886. The penalty assessed by the verdict of the jury was a term of three years in the penitentiary.

Maggie Schuster was the first witness for the State. She testified that she was in the employ of Mr. Eikel as household and kitchen servant, and had an apartment at his residence, on Austin street, in Waco, McLennan county. Witness occupied a room about fifteen feet distant from the room occupied by Mr. and Mrs. Eikel as their sleeping apartment. Witness knew the

defendant to be the man who entered her room on the night of March 24, 1886. She first saw the defendant about two weeks before the night of March 24, 1886. He passed witness on the street and bade her "good evening." Witness responded "good evening," as she always did to any one speaking to her similarly under similar circumstances. Witness thought no more of the incident until, reaching A. J. Taylor's house, she looked back and saw the defendant behind her. Witness went on, and just as she was going in at Eikel's gate the defendant asked her if she would not meet him at the gate at nine o'clock on that night. Witness went on in to the house. While the witness was at work in the kitchen that night some one knocked at the kitchen door. Witness, having no idea who it was, invited the knocker to "come in." Defendant stepped in to the kitchen and began talking to the witness. He said that he was tired, and asked for a chair, which witness gave him. He then proceeded to talk to the witness, telling her that he was in love with her. Witness then tried to prevail on defendant to leave, telling him that Mr. Eikel would come into the kitchen and discover him. Defendant refused to leave. About that time the front door bell rang. Witness went to answer the bell, and defendant got up and went off.

Witness went to bed about ten o'clock on the night of March 24, 1886. She was awakened at a later hour by the presence of some one in her room. That person put his hand on the witness's body and asked: "Don't you know me?" Witness, too much frightened to have her wits about her, replied: "No." Recovering herself, she ordered defendant to leave the room on pain of her calling for Mr. Eikel. Defendant refused to go, but placed his arm about witness's waist and his knee on the side of the bed, and attempted to force his way into the bed with witness. Witness then begged and implored him to leave the room, but to no purpose. She then got as near to the wall as she could, and told the defendant that if he did not leave the room instantly she would scream and call Mr. and Mrs. Eikel. The defendant thereupon caught the witness by the throat, and told her if she screamed or called he would cut her throat and shoot her. Witness was too much frightened to scream. Defendant finally sprang through the window and left. There was no possible doubt in the witness's mind as to the identity of the defendant. She could see him plainly by the moonlight which streamed into the room through the window, and, moreover, she knew him by his voice.

Witness's door was locked and her window was down when she went to bed that night. When she was awakened by the defendant the window was up. Witness did not give the defendant permission to enter her room. The witness could not tell the hour of night when she was awakened by the presence of the defendant in her room. She knew, however, that the moon was shining and that the chickens were crowing.

Cross-examined, the witness said that, when she woke up, on the night in question, she saw at once that her window was up, and was propped with a stick. No light was then burning in the room, but the moon light was bright enough to enable her to see. Defendant had on dark clothes, and was scented with the same kind of perfume he had on his person on the occasion of his visit to the kitchen. When he attempted to force his way into witness's bed he spoke of the ringing of the front door bell on the night of his visit to the kitchen. Witness saw the defendant once between his visit to the kitchen and the night he came into her room. Mrs. Eikel sent witness to a shoe shop kept by an Italian, with a pair of shoes to be repaired. As witness was going into the shop the defendant stopped at the door and asked her if she did not want a pair of shoes which he pointed out among the Italian's stock. Witness replied that she did not want the shoes, and after he left she asked the Italian who that fellow was. The Italian replied that he was a "fool mulatto." Up to this time witness had not suspected that defendant was other than a white man. Witness was an unmarried German woman, twenty-two years of age. She came to Waco from Tehuacana hills, about four months prior to this trial, since which time she had been living in the family of Mr. Eikel. Witness never permitted gentlemen to visit her private room. She made no out cry when defendant left her room by way of the window. She told no one of the occurrence on that night, but she told Mrs. Eikel about eight o'clock on the next morning. She was too much mortified and ashamed to tell Mr. Eikel. She did not then know that the defendant could be punished for intruding himself into her room. He made no bruises on the witness when he caught her by the throat. He did nothing more when he came into her room than the witness has stated. Witness gave Mr. Eikel a description of the defendant on the next morning. Two different parties, at different times, were brought to the witness for identification, neither of whom was the defendant. Defendant was finally arrested by Mr. Jenkins.

J. Eikel testified, for the State, in substance, that Miss Maggie Schuster, the alleged assaulted party, had been a domestic in his employ for about four months at the time of this trial. Miss Schuster, on the morning after the alleged assault, was in very evident distress of mind, and continued so for several days. She did not tell the witness of the occurrences of the night before, but, on his return home at noon, witness's wife related the circumstance to him. Miss Schuster described the intruder to the witness, and witness reported the matter to constable Jenkins. Jenkins arrested two mulatto men, whom he brought before Miss Schuster, but she declared neither of them to be the right man. On the second day after the occurrence, Miss Schuster came home from town, and reported that she had seen the man on the street. Witness took Miss Schuster to town with him, found Jenkins, and soon had the defendant in custody. Miss Schuster identified him as soon as she saw him. Miss Schuster's conduct since she had been in the witness's employ had been unexceptionable. She had not received the attention of gentlemen so far as witness knew, except two visits from a gentleman friend who lived at Tehuacana Hills.

Constable Lee Jenkins testified, for the State, in substance, that, on the morning after the alleged assault upon Miss Schuster, Mr. Eikel reported it to him, and gave him a description of the party accused by Miss Schuster. Witness arrested two parties whom he thought to conform to that description, but discharged them upon Miss Schuster's declaration that neither was the man. On the morning of the second day after the alleged assault, Mr. Eikel told the witness that Miss Schuster had seen her assailant on the street on that morning, and gave witness a description of the man as he was then dressed. After looking around for a while, witness found the defendant. He returned to Eikel and told him to bring the young lady to a certain point on Austin street, where he would have the party he had "spotted" engaged in conversation. The witness then went back to defendant and engaged him in conversation about a certain counterfeiting case. He told defendant that Eikel wanted to see him about that case, and would be along presently. About this time defendant said: "Yonder comes Mr. Eikel, now, and he has got a woman with him." Defendant thereupon said that he was cold, and wanted to step in to the barber shop near by, to get his coat, he being in his shirt sleeves. When Eikel and Miss Schuster came up, the latter said: "That is the man." Defendant replied: "I am

not the man. I can prove an alibi." Witness had then told defendant that the charge against him was an assault upon Miss Schuster, but had not told him when the assault was alleged to have been committed.

·Mr. Kernendo testified, for the State, that a few days before the alleged assault, Miss Schuster came to his shoe shop which was situated next to the defendant's barber shop. About the time Miss Schuster reached the witness's door, the defendant said something about the large shoe sign which hung in front of witness's shop. A few moments later, witness informed Miss Schuster that the defendant was a negro. The State closed.

Justice of the peace Sleeper testified, for the defense, that Miss Schuster made complaint before him against the defendant, a day or two after the alleged assault. Witness could not remember that Miss Schuster attempted to locate the exact hour of the assault, but she left upon the mind of the witness the impression that the assault occurred about one o'clock. Something was said about somebody coming home on a train and entering the gate at Eikel's about one o'clock, the noise made by the gate frightening the assailant off. Witness could not testify that Miss Schuster undertook to fix the hour of the assault.

Sam Washington testified, for the defense, that he was in Mr. Eikel's employ at the time of the alleged assault upon Miss Schuster. On the evening of the next day Mr. Eikel asked witness, among other employes, if he had seen a certain party loafing around doing nothing, whom he described as a man dressed in a light brown suit, with a peculiar scar looking mark about his mouth. Witness told Mr. Eikel that he had seen no such person.

Frank Johnson testified, for the defense, that he saw the defendant at the " O. K." barber shop in Waco, between half past nine and ten o'clock on the night of the alleged assault. He was dressed in a suit of dark clothes. Witness left the barber shop at about ten o'clock, at which time the defendant was still there.

Charles Thompson, the proprietor of the " O. K." barber shop, testified, for the defense, that the defendant came to his shop about nine o'clock on the night of the alleged assault upon Miss Schuster. Witness left the defendant at the shop at about ten, going off with Frank Johnson. He returned at about half past eleven and found defendant and some other boys still there, and

he left them there at about twelve when he, witness, went back to Frank Johnson.

Tanty Thompson testified, for the defense, that he met the defendant at the "O. K." barber shop at about half past eight o'clock on the night of the alleged assault. The parties present, who remained at the shop after it was closed up for the night, were the witness, the defendant, Hiram Watson, Will ·Mullins, Mose Anthony, Jesse Evans, Pete Perry and Frank Thompson. The parties named engaged in the game of shooting "craps," and kept it up until three o'clock in the morning. When the hour of three was struck by the town clock, some one of the parties proposed to adjourn the game, and the proposition prevailed. Witness saw John Wilkes and Frank Johnson at the shop on that night. They left about nine o'clock. Charley Thompson, the proprietor of the shop, came to the shop at about half past eleven o'clock, when the game of "craps" was suspended, as none of the parties wanted to be detected playing the game in the shop. Witness tried to get defendant to go home with him, as it was after three o'clock, and near day light. Defendant declined, remarking that, as he was winner on the game and was tired, he could afford to take a hack and go home. He then got in Jesse Evans's hack and rode off.

Hiram Watson, William Mullins, Frank Thompson, and Jesse Evans, testified, for the defense, substantially as did the witness Tanty Thompson, Evans stating, in addition, that he drove the defendant home in his hack, and put the defendant out at his home, about half past three o'clock.

Sallie Vaughan, the defendant's mother, testified, in his behalf, that she, defendant, and his wife, lived in the same house, occupying different rooms. Defendant came home between three and half-past three o'clock on the night of the alleged assault upon Miss Schuster. Of that fact the witness was absolutely certain, as she heard the clock strike three a few minutes before the defendant passed through her room en route to his, and told her that he had been out with the boys. Defendant entered the house at the door leading into witness's room, and passed thence into his own room, through the door connecting the two rooms. Witness heard defendant and his wife talking after defendant got in to his room. His wife reproached him for staying out so late. Witness had a sick child, and was frequently up during the night, administering medicine. Witness called to defendant's wife just as the clock struck three, and

asked her if defendant had yet got home. Defendant did not leave home after he returned at half past three o'clock.

Defendant's wife testified, in his behalf, that she went to bed on the night of the alleged assault at about nine o'clock, but did not close her eyes in sleep until the defendant's return, at about half past three o'clock in the morning. Defendant went immediately to bed on his return, and did not leave the house again until next day.

Cross-examined, witness testified that the door between the room occupied by her and defendant, and that occupied by defendant's mother, was closed and locked throughout that night. Defendant did not pass through his mother's room in to his and the witness's room, but was admitted by the witness through the kitchen. If defendant's mother was out of bed during the night the witness did not know it. Witness did not know that there was a sick child on the place that night, nor did she hear defendant's mother up, giving medicine. Witness said nothing to the defendant when he came home and went to bed. She did not reproach him for staying out late. Defendant's mother did not, at any time on that night, ask witness if defendant had come home. Being questioned particularly, the witness reiterated, with emphasis, that the defendant went into his room through the kitchen, and not through his mother's room, and that he did not speak to his mother, nor she to him. The defense closed.

J. Eikel testified, for the State, that his house was situated on Austin street, between Eighth and Ninth streets, about two blocks from where the defendant lived on Eighth street, and that a person could go from one house to the other in five minutes. The almanac disclosed that the moon rose on the night of the assault at three minutes past eleven o'clock.

The motion for new trial raised the questions discussed in the opinion.

*W. S. Baker* and *Clark & Dyer*, for the appellant.

*J. H. Burts*, Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE. This is an appeal from a conviction in the court below for assault with intent to commit rape.

In the ninth paragraph of the charge of the court to the jury, they were instructed that, "When an injury is caused by violence to the person the intent to injure is presumed, and it rests

with the person inflicting the injury to show the accident or innocent intention. The injury intended, which raises the presumption referred to in this paragraph, may be either bodily pain, constraint, a sense of shame, or other disagreeable emotions of the mind; but from such assault, no specific intent to have carnal knowledge in a manner to constitute rape is presumed by law, but such intent must appear from the evidence."

In Thomas's case, 16 Texas Court of Appeals, 535, which was an appeal from a conviction for assault with intent to rape, where a somewhat similar charge was given, this court says: "Whilst the paragraph is in almost the exact words of the code (Penal Code, Art. 485), and, in the abstract, is unquestionably correct, still we think it was error to give it in this case. The burden was upon the State, to show beyond a reasonable doubt, that the defendant committed the assault, and that he committed it with the specific intent of raping the person of the assaulted."

Again, the court charges the jury: "If you believe from the evidence beyond a reasonable doubt that, in the county of McLennan, and State of Texas, on the, or about the twenty-fourth day of March, 1886, the defendant did then and there unlawfully and feloniously use, or attempt to use unlawful violence upon the person of said Maggie Schuster, or did then and there make any threatening gesture showing in itself, or by words accompanying it, an immediate intention, coupled with an ability to use unlawful violence upon said Maggie Schuster, without her consent, by force or threats, as force and threats have been herein defined, and that said Maggie Schuster was then and there a female, you will find the defendant guilty of an assault with intent to commit rape as charged in the indictment, and assess his punishment at confinement in the penitentiary not less than two nor more than seven years; and, unless you so believe, you will find the defendant not guilty of the offense." This charge was erroneous in that, in effect, it told the jury that the offense of assault with intent to commit rape could be established by proof of threats, whereas such offense cannot be established by proof of threats, but only on proof of force, or attempted force. The offense of an *attempt* to commit rape may, it is true, be sustained on proof of threats, but an assault with intent to commit rape can not. The offense of an attempt to commit rape may be predicated upon force, threats, or fraud; but threats or fraud have no part in an assault with intent to commit rape, which must be the result of force or attempted force

alone. In other words, where it is attempted by threats or fraud, such as are spoken of in the statutory definition of the offense, and such terms are defined in connection with the offense by Articles 528, 530, and 531, Penal Code, an indictment will lie alone for an attempt to commit rape; but if force is an element in the attempted commission of rape, then, indeed, resort may be had to the statute of assault with the intent to commit the offense. (Art. 503, Penal Code.)

"An assault with intent to commit any other offense is constituted by the existence of the facts which brings the offense within the definition of an assault, coupled with an intention to commit such other offense." (Penal Code, Art. 506.)

A person can not be convicted of an attempt to rape under an indictment for assault with intent to rape. (Brown v. The State, 7 Texas Ct. App., 569.) It may be that, under the charge of the court as above quoted, the jury have been misled in to finding appellant guilty upon a state of facts which would alone be applicable to establish the offense of an attempt to rape.

For these errors in the charge of the court to the jury, the judgment is reversed and the cause remanded.

*Reversed and remanded.*